RECEIVED

MAR 21 2018

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| ALEX BAUDOIN, ET AL | CIV. ACTION NO. 6:12-00657 |
| VERSUS | JUDGE JAMES T. TRIMBLE, JR. |
| BLUECROSS BLUESHIELD OF LOUISIANA incorporated as LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY | MAG. JUDGE HANNA |

## MEMORANDUM RULING

The instant Petition for Damages, Penalties and Attorney's Fees against Defendant, BlueCross BlueShield of Louisiana, incorporated as Louisiana Health Service & Indemnity Company ("BCBS") is an ERISA case wherein Plaintiffs are suing BCBS for benefits due under Plaintiffs' health insurance contract, penalties in the amount of double the amount of benefits due, attorney's fees, legal interest from the date of judicial demand, and costs.

Plaintiffs allege that BCBS improperly denied mental health benefits for Alex's treatment received at The Meadows at Wickenburg, Inc. ("The Meadows") in Arizona and the JayWalker Lodge (the "Lodge") in Colorado. There is no dispute that the health plan is governed by ERISA; thus, ERISA preempts all state law claims. BCBS maintains that the Plaintiffs are seeking to recover benefit payments not due under the Plan, and thus their denial was proper.

## BACKGROUND AND PROCEDURAL HISTORY

Scotty and Maggie Baudoin are the parents of Alex Baudoin. At all times pertinent, BCBS was the insurer of the Baudoin family through Mr. Baudoin's employer. On October

1

15, 2010, Alex was experiencing severe depression and polysubstance dependence. On that same day, Plaintiffs assert that Alex attempted to end his life.[1]

The next day, Alex's family coordinated a meeting with counselor, Roy Petitfils, who examined and evaluated Alex[2] ultimately concluding that based upon Alex's symptoms, Alex required 24-hour staff supervision. Mr. Petitfils recommended that Alex be immediately placed in inpatient treatment.

*The Meadows*

Mr. and Mrs. Baudoin took their son to The Meadows in Wickenburg, Arizona where he received in-patient care from October 21, 2010 through November 24, 2010. The Baudoins claim that The Meadows advised them that BCBS had been notified and the benefits for the inpatient care had been verified. The total charges by The Meadows for Alex's treatment was $40,799.92; the majority of this amount had to be paid in advance. Mr. and Mrs. Baudoin borrowed money to pay the amount.

A claim was filed with BCBS which forwarded the claim to Magellan Health Services ("Magellan")[3] for a retroactive review for authorization of the inpatient care. Ultimately, BCBS denied all of the charges for various reasons including inadequate medical information from the provider, a wrong form was filed and items for personal

---

[1] Plaintiffs assert this in their brief, but do not refer the court to any evidence in the administrative record to corroborate the fact that Alex attempted to commit suicide.
[2] The only date this court has been provided as to when that examination took place is March 16, 2011. See R. #33-1, p. 907-909. The court has not been provided with any reference in the Administrative Record as to when the examination and evaluation took place and/or the results thereof other than Mr. Petitfil's affidavit which states that he met with Alex one time on March 16, 2011. Even if there was a mistake as to the date, and it should be March 16, 2010, due to the actual admission date of October 21, 2010, this examination would be irrelevant as to Alex's condition when he was actually admitted to The Meadows.
[3] Magellan is the administrator of Defendant's Managed Mental Health Program.

convenience were excluded. Mr. Baudoin provided additional information and appealed the denial.

In two separate letters, Magellan corresponded with Alex Baudoin and advised that his inpatient treatment was not medically necessary based on the 2010 Magellan Behavioral Health Medical Necessity criteria, i.e **"the medical necessity criteria for the requested level of care were not met."**[4] Specifically, the first letter dated March 25, 2011 stated that

> **[b]ased on the records submitted, your vital signs were stable and it appeared there was no substance related withdrawals. You were not an imminent danger to yourself or others and did not appear to require 24 hour staff supervision. You could have safely and effectively been treated in a less intensive level of care.**[5]

The second letter also dated March 25, 2011 stated that

> **[b]ased on the records submitted, you were not experiencing any substance related withdrawals. You did not have any major medical or psychiatric co-morbid problems that required 24 hour staff supervision. You were not an imminent danger to yourself or others. You had support available. You could have safely and effectively been treated in a less intensive level of care.**[6]

The Baudoins, via The Meadows, appealed the denial: Magellan again forwarded a letter dated May 2, 2011 again determining that Alex's in-patient treatment was not medically necessary for the following reasons:

> Based on the medical records submitted, you are not an imminent danger to yourself or others. There were no logistic impairments such as distance from treatment facility,

---

[4] R. #33-1, p. 186 and 196.
[5] R. #33-1, p. 187.
[6] Id. p. 197.

> mobility, limitations that preclude participation in a partial hospital setting. You were not exhibiting any symptoms that require 24-hour nursing care. You could have been safely and effectively treated at a less-intensive level of care.

In response, the Baudoins forwarded correspondence and a sworn Affidavit by Roy Petitfils in an attempt to convince BCBS and/or Magellan that Alex's inpatient treatment was medically necessary. The April 7, 2011 letter authored by Mr. Petitfils stated the following:

> Alex called and asked to see me because he was considering hurting himself. He was especially concerned because during the previous four months he had experienced increasingly frequent and intense thoughts of self-harm including suicide. In a two hour-long visit Alex chronicled for me his history of substance abuse beginning in high school, continuing to the present.
>
> Alex was forthcoming about his many sincere, yet unsuccessful attempts to get "clean" and away from several addictive substances including but not limited to marijuana and alcohol. He said he felt "like giving up."
>
> When I met with Alex, he met the criteria for a Substance Dependence Disorder with subsequent substance induced depressive episodes. . . .[7]

The letter was considered a first level appeal of the denial; Magellan reviewed the appeal and again determined that the inpatient admission was not medically necessary.[8] Plaintiffs then filed the instant lawsuit; it was then determined that Plaintiffs had not

---

[7] R. #33-1, p. 208.
[8] Magellens' licensed board-certified psychiatrist made the determination after a review of all of the medical records and information submitted.

exhausted their administrative remedies. Consequently, the lawsuit was stayed pending the appeal.

The second level appeal was conducted by an Independent Review Organization,[9] MCMC and a physician, board-certified in psychiatry and child psychiatry concluded that the inpatient services were not medically necessary.

After leaving The Meadows, Alex was admitted to JayWalker for inpatient aftercare from November 27, 2010 until his discharge on April 18, 2011. The charges for the JayWalker services was $51,250. JayWalker filed a claim which was returned because the claims were not on the proper forms and did not contain all of the necessary information.

At that time, the instant lawsuit had been filed; counsel for Plaintiff and BCBS were able to obtain the proper information to process the claim for benefits. Magellan reviewed the claim but denied the benefits finding that the JayWalker services were not medically necessary. Specifically, Magellan found that Alex's aftercare did not meet the guidelines for "Magellan MNC Residential Treatment, Substance Use Disorders, Rehabilitation, Adult and Geriatric." On appeal, Magellan again concluded that the services were not medically necessary. Thereafter, Plaintiffs filed the second level appeal to an Independent Review Organization where the appeals board concluded that the JayWalker services were not medically necessary.

---

[9] La. Admin. Code Title 37, pt. XIII, § 6203 and La. R.S. 22:2431, *et seq.,* establishes that the Commissioner approve independent review organizations eligible to be assigned to conduct external reviews. When an external review is requested, the Commissioner randomly assigns that case to an approved Independent Review Organization for an external review.

## STANDARD OF REVIEW

A denial of benefits challenged under § 1132(a)(1)(B) is generally reviewed under a *de novo* standard unless the benefit plan gives the Plan Administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.[10] If the plan grants the Plan Administrator discretion, BCBS's determinations are reviewed only for abuse of discretion.[11] Under an abuse of discretion standard, the court considers whether BCBS's actions were arbitrary and capricious.[12]

The BCBS Plan states that "[t]he company has full discretionary authority to determine eligibility for Benefits and/or construe the terms of this Benefit Plan."[13] Plaintiffs complain that even though the Plan defines "Company" as Blue Cross and Blue Shield of Louisiana,"[14] the "Plan Administrator" is not defined. Plaintiffs suggest that the absence of a defined "Plan Administrator" is the insurer's attempt to take advantage of the favorable standard of review. In other words, insurers wish to be identified as the Plan Administrator in order to have the final review afforded to such Administrators. Thus, Plaintiffs argues that the Plan does not grant the Plan Administrator discretionary authority, which would cause the standard of review by this court to be a *de novo* review.

As noted by BCBS, the Plan authorizes BCBS to delegate "[a]ny of the functions to be performed by [BCBS] under this Benefit Plan," to third parties.[15] 29 U.S.C. § 1105(c)(1)B) authorizes such delegations and states that the Plan documents may

---

[10] Firestone Tire & Rubber Co. V. Bruch, 489 U.S. 101, 448, 109 S.Ct. 948 (1989).
[11] See Vercher v. Alexander & Alexander, Inc., 379 F.3d 222, 226 (5th Cir. 2004); Bruch, 489 U.S. at 115.
[12] Lain v. UNUM Life Ins. of America, 279 F.3d 337, 342 (5th Cir. 2002).
[13] R. #33, p. 71.
[14] Id. p. 19.
[15] 29 U.S.C. § 1002(21)(A).

expressly provide for, "... named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities ... under the Plan."[16]

The court finds that the Plan grants BCBS discretionary authority to determine eligibility for benefits or to construe the terms of the Plan. Accordingly, the standard or review by this court will be under an abuse of discretion standard. Our review is a "two-step process when conducting [an] abuse of discretion review."[17] A court must first determine the legally correct interpretation of the plan and inquire as to whether the interpretation was consistent with a fair reading of the Plan. If BCBS's interpretation of the Plan was legally correct, there is no abuse of discretion.[18] If we find that BCBS did not give the Plan the legally correct interpretation, then we must determine if BCBS's decision was an abuse of discretion.

Abuse of discretion is synonymous with the arbitrary and capricious standard.[19] A decision is arbitrary and capricious only if "made without a rational connection between the known facts and the decision or between the found facts and the decision.[20]

## ANALYSIS

BCBS maintains that its interpretation of the Plan was consistent with a fair reading of the Plan. Moreover, its determination that Alex's inpatient treatment was not medically necessary was consistent with a fair reading of the Plan. Plaintiffs, on the other hand,

---

[16] 29 U.S.C. § 1105(c)(1)(B); see Chevron Chem. Co. v. Oil, Chem. and Atomic Workers Local Union, 47 F.3d 139, 144 (5th Cir. 1995)(determining that a Plan Administrator could delegate fiduciary responsibility because the appointment of a reviewer was expressly provided for in the Plan documents).
[17] Stone v. Unocal Termination Allowance Plan, 570 F.3d 252, 257 (5th Cir. 2009).
[18] Id. at 258.
[19] Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan, 493 F.3d 533, 540 (5th Cir. 2007).
[20] Meditrust Financial Services Corp. v. Sterling Chemicals, Inc., 168 F.3d 211, 215 (5th Cir. 1999).

maintain that Alex's inpatient treatment met the criteria for allowing benefits for inpatient treatment.

The Plan defines "inpatient" as a plan member whose "medical symptoms or conditions must require continuous twenty-four (24) hour a day Physician and nursing intervention."[21] The Plan further provides that "[i]f the services can be safely provided to the Member as an Outpatient, the Member does not meet the Criteria for an Inpatient.[22] The Plan defines "Medically Necessary (or Medical Necessity) as:

> Health care services, treatment, procedures, equipment, drugs, devices, items or supplies that a Provider, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are;
>
> A. In accordance with nationally accepted standards of medical practice;
>
> B. Clinically appropriate, in terms of type, frequency, extent, level of care, site and duration, and considered effective for the patient's illness, injury or disease; and
>
> C. Not primarily for the personal comfort or convenience of the patient, or Provider, and not more costly than alternative service, treatment, procedures, equipment, drugs, devices, items, supplies or sequence thereof and that are as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.
>
> For these purposes, "nationally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations and the views of Physicians practicing in relevant clinical areas and any other relevant factors.[23]

---

[21] R. #33, pp. 35, 51, 126, 141.
[22] Id. pp. 22, 133.
[23] R. #33, p. 23, 113-114.

8

BCBS asserts that Magellan used criteria developed with input from peer reviewed scientific literature, national mental health care standards, regulatory agencies, and a behavioral health advisory committee made up of behavioral health care practitioners, network providers, and national consultants.[24]

BCBS's denials for benefits at The Meadows were based on a review of the medical records wherein Magellan concluded that Alex (1) had stable vital signs, (2) had no substance abuse related withdrawals; (3) was not an imminent danger to self or others; (4) did not require 24-hour supervision, (5) could have safely and effectively been treated in a less intensive level of care; (6) had support available; and had no history of seizures or complicated withdrawal symptoms.[25]

BCBS's denial for benefits to JayWalker was based on (1) there being no evidence that a face to face behavioral health assessment occurred, thus no clear basis for the diagnosis or for the treatment, (2) there was no clear current risk of inpatient care or harm to self or others if treatment were not provided at this level of care, and (3) it was not clear that his resources and support were not sufficiently available within his own support system.[26]

*The Criteria used for admission*

Plaintiffs maintain that the criteria used to determine "medical necessity" is not found in the BCBS Plan, and that the 2010 Magellen Behavioral Health Medical Necessity

---

[24] Id. pp. 186, 196, 211, 219, 379, 500.
[25] Id pp. 187, 197, 212, 220.
[26] Id. p. 1279.

9

criteria" imposes a greater burden and restriction on mental health patients than on other non-mental health patients. Thus, Plaintiffs argue that Defendant's use of said criteria is illegal and cannot form the basis of a valid denial of benefits. Plaintiffs rely on the Mental Health Parity Act[27] and the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (the "Parity Act")[28] which encompasses (1) financial requirements[29] and treatment limitations. The term "treatment limitations" includes the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment.[30] The Parity Act provides that (1) the treatment limitations applicable to mental-health benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits (non-mental health benefits) covered by the plan (or coverage); and (2) there are no separate treatment limitations that are applicable only with respect to [mental-health benefits].[31]

The Administrative Record provides the following regarding the criteria used for Alex's admission:

> 2010 Hospitalization, Substance Use Disorders, Detoxification7
>
> **Criteria for Admission**
>
> The Specified requirements for severity of need and intensity and quality of service must be met to satisfy the criteria for admission.
>
> I.   **Admission – Severity of Need**

---

[27] 29 U.S.C. § 1185.
[28] 29 U.S.C. § 1185a(a)(3)(A)(i)-(ii), (B)(i).
[29] Such as co-payments and deductibles.
[30] 29 U.S.C. § 1185a(a)(3)(B)(iii).
[31] Id. at § 1185a(a)(3)(A)(ii).

Criteria A,B and C must be met to satisfy the criteria for severity of need.

A. The Patient has a recent history of heavy and continuous use of substances that have withdrawal syndromes that can be potentially life threatening or cause serious physical harm, or cause physical withdrawal symptoms that are uncomfortable and disruptive enough to make it highly unlikely that the patient would be able to comply with outpatient treatment. This does not include the patient having mere physical or mental discomfort. Not Met.

B. Detoxification at a lesser intensive level of care would potentially be unsafe as evidenced by one of the following;

1)the patient presents with either:

Signs and symptoms of an impending withdrawal syndrome that has the imminent potential to be life threatening or produce serious physical harm *or* a history of withdrawal seizures, delirium tremens, or other life threatening complications of withdrawal from substances.

or

2) the patient presents with co-morbid medical conditions that are likely to complicate the management of withdrawal to the degree that the patient's life would be endangered. Not met

C. Organized support system and/or less-intensive level of care services cannot be established at this time. Not met

II. **Admission – Intensity and Quality of Service**

Criteria A, B, C, C,E, and F must be met to satisfy the criteria for intensity and quality of service.

The evaluation and assignment of the diagnosis must take place in a face-to-face evaluation of the patient performed and documented by an attending physician prior to, or within 24 hours following the admission.
Hospital Substance Detoxification14

11

B. This care must provide an individual plan of active medical treatment that includes 24-hour access to full spectrum of physician and nurse staffing. This staffing must provide 24-hour services, including skilled observation and medication administration.

C. Documentation of blood and/or urine drug screen is ordered upon admission.

D. Treatment includes an individualized treatment plan based on an evaluation of both mental health and substance abuse conditions and include aftercare needs.

E. Treatment interventions are guided by quantitative measures of withdrawal such as the CIWA-Ar or COWS.

F. A discharge plan is formulated at admission and is directly linked to the behaviors and/or symptoms that resulted in admission, and begins to identify appropriate post-hospitalization treatment resources.[32]

Plaintiffs have failed to persuade the court through the administrative record and arguments that the financial requirements and treatment limitations in the BCBS Plan and the criteria used by Magellen to determine "medical necessity" are more restrictive and/or are more burdensome for mental health patients than for non-mental health patients. Thus, we find no merit to Plaintiffs' argument that the criteria used by Magellan to determine if Alex's treatment in both The Meadows and the JayWalker Lodge was illegal.

*The Meadows*

Plaintiffs submit the affidavit of Roy Petitfils, who was, at the time, a counselor at the Pax Renewal Center in Lafayette, Louisiana. According to Mr. Petitfils, he met with

---

[32] Id. pp. 192-194.

Alex on March 16, 2011, some five months after Alex presented himself at The Meadows. In his Affidavit, Mr. Petitfils attests that Alex (1) "was exhibiting physical symptoms associated with his attempts to detoxicate himself from substances," "including but not limited to shakiness and jitteriness" (2) "when I met Alex on March 16, 2011, was my assessment that he had a significant risk of causing himself serious and potentially fatal injuries", (3) "he repeatedly reiterated that he no longer had a desire to live and further that he was having increasing frequency of suicidal thoughts" "he advised that shortly before I met him, he had been seriously contemplating ending his life" and (4) "had unsuccessfully attempted to obtain medical help using a less-intensive level of care which had not been successful."[33] Mr. Petitfils opined that he believed that Alex was in imminent danger to himself and recommended that he be placed in inpatient treatment.

Plaintiffs complain that Magellan did nothing more than review Alex's medical records after he was already admitted to The Meadows and that each of the denials provides different reasons for why Alex's treatments were not "medically necessary". Plaintiffs assert that Magellan's determinations directly contradict Mr. Petitfil's personal examination of Alex on March 16, 2011. The court notes that the medical records commenced on the day Alex presented at The Meadows on October 21, 2010, whereas Mr. Petitfil's affidavit, dated January 11, 2012, was based on Mr. Petitfil's examination on March 16, 2011.

Magellan's medical reviewer noted that Alex's medical records when he presented at The Meadows revealed that on admission, Alex (1) had stable vital signs, (2) did not

---

[33] Id. p. 907-908.

experience any acute substance related withdrawal, (3) did not report to have any suicidal or homicidal ideations, and (4) did not appear to need 24 hour supervision.[34]

In order to determine if inpatient treatment was medically necessary, Magellan utilized the definition of medically necessary in the Plan along with its criteria for psychiatric inpatient hospitalization which BCBS asserts was developed with input from peer reviewed scientific literature, national mental health care standards, regulatory agencies and a behavioral health advisory committee made up of behavioral health care practitioners, network providers, and national consultants.[35]

According to the plan, and Magellan's criteria, there must be a showing that the patient requires an individual plan of active psychiatric treatment that includes 24-hour access to the full spectrum of psychiatric staffing.[36] With respect to inpatient admission for mental health and/or substance abuse treatment, the criteria requires a showing of clinical evidence that the patient would be at risk to self or others if he/she were not in a residential program; a high degree of potential of the condition leading to acute psychiatric hospitalization in the absence of residential treatment.[37]

Based on the inpatient treatment at The Meadows, Magellan determined that Alex did not satisfy the Medical Necessity Criteria because the medical and clinical records demonstrated that upon admission, Alex (1) had stable vital signs; (2) had no substance abuse related withdrawals; (3) was not an imminent danger to self or others; (4) did not require 24-hour supervision; (5) could have safely and effectively been treated in a less

---

[34] R. #33-1, p. 193.
[35] Id. pp. 186, 196, 211, 219, 370, 500, 509, 519, 527, 1154, 1162, 1179.
[36] Id. pp. 192, 533, 525, 302, 226, 507, 517, 023, 113-114.
[37] Id. pp. 192, 217, 533, 1255, 1280, 1258-1259, 1283.

14

intensive level of care; (6) had support available; and (7) had no history of seizures or complicated withdrawal symptoms.[38]

While Plaintiffs suggest that Magellan's determinations are in direct contradiction to Mr. Petitfil's affidavit, to the extent that the personal examination of Alex by Mr. Petitfils on March 16, 2011 is contradictory, the court finds that if March 16, 2011 is the correct date of the examination, which is months after Alex's admission to The Meadows, we give no weight to Mr. Petitfil's affidavit. Mr. Petitfil also authored a letter on April 7, 2011 to Magellan in an attempt to persuade BCBS and/or Magellan that Alex met the criteria for a "Substance Dependence Disorder."[39] The court notes that the letter does not state when Mr. Petitfil met with Alex. The court further notes that Mr. Petitfils is a counselor, not a physician or a psychiatrist. The substance of the letter noted that Alex had called Mr. Petitfils and asked to meet with the counselor because he was considering hurting himself and that for months prior he experienced frequent and intense "thoughts" of self-harm including suicide. Again, this letter does not inform the court of when this counseling session took place, only that it was a two hour-long meeting. Be that as it may, the medical and clinical records indicate that the relevant time period – upon admission— Alex was not a harm to himself or to others, he had no acute withdrawal symptoms, he had stable vital signs, and was not in imminent danger.

The Meadows Initial Psychiatric Evaluation indicates that Alex had never had an inpatient admission, a suicide attempt or self-harming history, and the risk for same was

---

[38] Id. pp. 187, 197, 212, 220.
[39] R. 33-1, p. 208/

low.[40] Thus, we can only conclude that BCBS/Magellan's decision to deny the benefits as not medically necessary, was not arbitrary and capricious.

*JayWalker Lodge*

Alex received "inpatient aftercare" from November 27, 2010 through April 18, 2011 at the JayWalker Lodge.[41] Magellan determined that Alex's aftercare at the Lodge was not medically necessary and denied the claim. BCBS denied both the first and second level of appeals affirming its original conclusion that the "inpatient" aftercare was not medically necessary.[42] Specifically, it was determined that there was (1) no evidence that a face to face behavioral health assessment occurred; (2) no clear current risk of inpatient care or harm to self or others if treatment was not provided at this level of care; and (3) it was not clear that Alex's resources and support were not sufficiently available within his own support system.[43]

Plaintiffs maintain that Alex was receiving valid and necessary medical treatment and counseling at the Lodge,[44] a face-to-face assessment did occur when Alex arrived at the Lodge,[45] and that even though the medical records do not show weekly assessments, they do show periodic assessments and status reports.[46] Plaintiffs further refer the court to a note from the Lodge in which Alex, during a group session dated 2/19/11, "melted down and threaten[ed] to commit suicide or use drugs."[47] The court notes that on that

---

[40] Id. p. 299, 301.
[41] Id. pp. 1211-1213, 1215-1217.
[42] The second level of appeal was by and Independent Review Organization.
[43] Id. p. 1279.
[44] Id. p. 1237–1253.
[45] Id. pp. 1238-1240.
[46] Id. pp. 1241-1248.
[47] Id. p. 1243.

same day, the author noted that "[h]e (referring to Alex) denied wanting to hurt himself and said he was not craving to use."[48]

As to Alex's resources and support, or the lack thereof, Plaintiffs argue that this factor is not related to "medical necessity."

As noted by Defendant, there is no indication that upon his admission or thereafter, that Alex was a clear current risk of harm to himself or others if treatment was not provided at this level of care. As noted in The Meadows Initial Psychiatric Evaluation, the risk assessment for suicide, self-harm or harm to others was low.[49] Thus, we cannot say that there was no rational basis in the administrative record for the denial. Consequently, Plaintiffs have not established the BCBS's decision to deny coverage at the JayWalker Lodge was an abuse of discretion.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Petition for Damages, Penalties and Attorney's Fees against Defendant, BlueCross BlueShield of Louisiana, incorporated as Louisiana Health Service & Indemnity Company shall be dismissed with prejudice at Plaintiffs' costs.

**THUS DONE AND SIGNED** in Alexandria, Louisiana on this 21st day of March, 2018.

JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE

---

[48] Id.
[49] R. #33-1, p. 301.